# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Owner-Operator Independent Driver
Association, Inc., a Missouri non-profit
entity;  and Stephen K. House, a natural
person,

Civil No. 09-1116 (DWF/RLE)

        Plaintiffs,

v.

Mark Dunaski, Ken Urquhart, James Ullmer,
Doug Thooft, Christopher Norton, and John
Doe, all personally, individually, and in their
official capacities,

**MEMORANDUM
OPINION AND ORDER**

        Defendants.

_____

Albert T. Goins, Sr., Esq., Goins Law Offices, Ltd., and Daniel E. Cohen, Esq., Joyce E.
Mayers, Esq., Paul D. Cullen, Jr., Esq., and Paul D. Cullen, Sr., Esq., counsel for
Plaintiffs.

Marsha Eldot Devine, and Thomas C. Vasaly, Assistant Attorneys General, Minnesota
Attorney General's Office, counsel for Defendants.
_____

## INTRODUCTION

In this lawsuit, Plaintiffs Owner-Operator Independent Drivers Association, Inc.

("OOIDA") and Stephen K. House challenge a fatigue enforcement program initiated by

Defendants, who are officers and officials of the Minnesota State Patrol ("MSP").

Pursuant to the parties' request, the Court issued an Order on July 30, 2010, ruling on the

parties' summary judgment motions.  (Doc. No. 106.)  Later, Plaintiffs requested that the

Court enter a Memorandum Opinion and Order.  Therefore, this Memorandum Opinion

and Order follows the Court's July 30, 2010 Order and reflects the facts as presented to the Court at that time. This Order does not change the rulings made in the July 30, 2010 Order; rather, it provides additional background, legal authority, and analysis used to reach the decisions made in the July 30, 2010 Order.

## BACKGROUND

### I.      The Parties

#### A.      Plaintiffs

OOIDA is a non-profit organization with offices in Missouri and Washington, D.C. OOIDA's members are owners and operators of commercial motor vehicles. Plaintiff House is a licensed commercial vehicle driver with over 30 years of experience. House resides in the state of Washington with his wife, Jeanette House, who also is a licensed commercial vehicle driver. House and his wife own Eagle Trucking Enterprises, Inc., which in turn employs House to operate a commercial motor vehicle. House is a member of OOIDA. On May 10, 2008, House was stopped by members of the MSP at the Red River Weight Station in Minnesota.

#### B.      Defendants

The MSP is a statewide police force and is a division of the Minnesota Department of Public Safety. The MSP is comprised of sixteen divisions and eleven operational sections. The section at issue in this case is the statewide Commercial Vehicle Enforcement Section - District 4700 (the "Section"), which regulates statewide scales and commercial vehicle services. Specifically, the Section enforces the Federal Motor Carrier

Safety Regulations ("FMCSRs") and other applicable state statutes in an effort to promote safe and efficient operation of commercial vehicles. The Section is comprised of Troopers and Law Compliance Representatives ("CVIs"). Troopers are sworn, licensed peace officers. CVIs are civilians who work for the Section. CVIs are not peace officers. Troopers' and CVIs' authority and limits on that authority are derived from applicable statutes, case law, rules and regulations, and the MSP's own policies.

Defendant Mark Dunaski is the MSP's Chief Patrol Officer. He is not involved in day-to-day operations of the Section. Defendant Ken Urquhart is a Captain in the MSP, and he is the designated Operational Commander of the Section. Dunaski and Urquhart were not present at the Red River Weight Station on May 10, 2008. Defendant Doug Thooft is a Lieutenant in the MSP and oversees the Section's functions in southeastern Minnesota. Thooft was present at the Red River Weight Station on May 10, 2008, but he did not have any direct involvement with House. Defendants Chris Norton and James Ullmer are CVIs. Both Norton and Ullmer had direct involvement with House on May 10, 2008.

## II.     Applicable Regulations

### A.     MCSAP and FMCSR

The Motor Carrier Safety Assistance Program ("MCSAP") is a nationwide grant program facilitated by the United States Department of Transportation ("USDOT") to further vehicle safety in partnership with the states by providing grant resources to those states. There are five elements to the MCSAP: (1) driver/vehicle inspections; (2) traffic

enforcement; (3) compliance reviews; (4) public education and awareness; and (5) data collection. 49 C.F.R. § 350.109. The first element is at issue in this case.

Under the MCSAP, individual states are the primary enforcers of the highway safety regulations at roadside inspections. Specifically, in return for their acceptance of MCSAP grants, states assume responsibility for enforcing the FMCSR or other compatible state rules. 49 C.F.R. § 350.201; *see also Nat'l Tank Carriers v. Fed. Highway Admin. of the U.S. Dept. of Transp.*, 170 F.3d 203, 204-06 (D.C. Cir. 1999) (discussing history of MCSAP). Minnesota has participated in MCSAP since approximately 1984. Specifically, section 221.605 of the Minnesota Statutes requires interstate carriers and drivers to comply with the FMCSRs. In Minnesota, MCSAP funding is divided between MSP and the Minnesota Department of Transportation ("MnDOT"). Both the MSP and the MnDOT are responsible for enforcing the FMCSRs, including the issuance of citations and out-of-service orders. Minn. Stat. § 221.605, subds. 2 and 3.

The FMCSRs require carriers and drivers to be familiar with and to comply with the FMCSRs. 49 C.F.R. §§ 390.11, 392.1. Moreover, section 392 of the FMCSRs, which pertains to commercial motor vehicles, requires carriers and drivers to operate their vehicles in accordance with the laws, ordinances, and regulations of the jurisdiction in which a vehicle is being operated, unless the FMCSRs impose a higher standard of care than the applicable jurisdiction. 49 C.F.R. § 392.2. Relevant to this case is section 392.3, which is entitled "Ill or Fatigued Driver" and provides, in relevant part:

No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.

49 C.F.R. § 392.3.

## B.    The CVSA

The Commercial Motor Carrier Safety Alliance ("CVSA") is an international not-for-profit private organization comprised of local, state, provincial, territorial, and federal motor carrier safety officials and industry representatives from the United States, Canada, and Mexico. CVSA's mission is "to promote commercial motor vehicle safety and security by providing leadership to enforcement, industry and policy makers," with the goal of "uniformity, compatibility and reciprocity of commercial vehicle inspections, and enforcement activities throughout North America by individuals dedicated to highway safety and security."  http://www.cvsa.org  (last visited July 27, 2010.)  The CVSA has developed a North American Standard Training and Inspections ("NAST") criteria. Specially-trained instructors in each jurisdiction are authorized to conduct NAST inspections.  As part of the inspection criteria, the CVSA has developed the North American Vehicle Uniform Out-of-Service Criteria ("OOSC") for the issuance of out-of-service orders ("OOS orders").  All states participating in the MCSAP have agreed that their inspectors will use the OOSC to carry out their functions under the FMCSR specifically with respect to the issuance of OOS orders.  *Nat'l Tank Carriers*, 170 F.3d at 205.  Specifically, the FMCSR defines an out-of-service order as:

a declaration by an authorized enforcement officer of a Federal, State, Canadian, Mexican, or local jurisdiction that a driver, a commercial motor vehicle, or a motor carrier operation, is out-of-service pursuant to §§ 386.72, 392.5, 392.9a, 395.13, 396.9, or compatible laws, or the North American Standard Out-of-Service Criteria.

49 C.F.R. § 390.5. Therefore, under the FMCSRs, an authorized officer may issue an OOS order for violations of the OOSC. Defendants Ullmer and Norton were both NAST-certified inspectors on May 10, 2008.

There are seven levels of NAST inspections. http://www.cvsa.org. At issue in this case is a Level III inspection, which involves the inspection of the status of a driver to determine whether he or she is too ill or fatigued to continue to operate a commercial vehicle. The parties agree that generally a Level III inspection includes interviewing the driver and also observing the driver, the condition of the vehicle, the contents of the cab, the driver's commercial driver's license, medical card, log books, and shipping documents. (*See id.*; *see also* Doc. No. 83 at 6; Doc. No. 85 at 13.)

### C. Minnesota's Fatigue Enforcement Program

Beginning in 2005, the Section began focusing on the possible contributing factors of commercial vehicle accidents in an effort to reduce the number of accidents on Minnesota's roadways. The Section created an enforcement program that focused on combating commercial vehicle driver fatigue, impairment, seatbelt violations, and other traffic violations (the "FIST program.") The FIST program focused on driver interviews at weight stations and roadside inspections. As part of the FIST program, a Fatigued Driver Evaluation Checklist was developed as an alternative to field reports to make it

easier for troopers and CVIs to document their observations about fatigue from driver interviews. There are factual disputes concerning how this checklist was used and what, if any, Minnesota regulations have been enacted or what criteria and training are used with respect to how drivers are evaluated for fatigue in Minnesota. In May 2010—on the date that Defendants' summary judgment motion was due—the MSP issued a General Order that made significant policy changes to how fatigue inspections were conducted by the MSP.

III.     **May 10, 2008 Incident**

On May 10, 2008, the MSP was conducting a FIST program saturation exercise at the Red River Weight Station in Minnesota. A saturation exercise is when a group of MSP personnel gets together and saturates one area for enforcement purposes. On that date, at approximately 8:15 p.m., while driving a commercial vehicle, House was stopped at the Red River Weight Station while on his way to Michigan. Jeanette House and their son were also in House's vehicle. Norton conducted a NAST Level III inspection of House. Ullmer observed the inspection. Norton first asked House to produce his log book,[1] bills of lading, and commercial driver's license. After that, Norton asked House to come into the weigh station to complete the inspection, but Norton did not explain to House that a FIST saturation exercise was being performed. House came into an office with Norton and Ullmer. There, Norton and/or Ullmer asked House questions about,

---

[1]     House's log book was in compliance with Minnesota and federal law, and House was operating within the applicable hours-of-service ("HOS") regulations.

(Footnote Continued on Next Page)

among other things, House's neck size, how often House used the restroom at night, whether House had a television or computer in his cab, and whether House had any *Playboy* magazines in his cab. Norton also had a discussion with House concerning whether House could sleep in his cab with two other people in the cab. Norton also asked why House's eyes were red, and House explained that he had allergies. Both Norton and Ullmer used the checklist during their inspection of House. After the inspection, Norton issued House an OOS Order.[2]

After receiving the OOS Order, Jeanette House began driving the vehicle to finish the trip to Michigan. Sometime thereafter, House contacted OOIDA to file a complaint concerning the OOS order. However, House never contacted anyone from the MSP or the FMCSA to complain about the May 10, 2008 OOS Order. On May 13, 2009, Plaintiffs filed suit against Defendants in this Court. Plaintiffs moved for partial summary judgment, and Defendants moved for summary judgment.

## DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank*

---

(Footnote Continued From Previous Page)

[2]     The May 10, 2008 OOS Order did not affect House's trucking company's safety rating.

(Footnote Continued on Next Page)

*of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

I.    **Legal Analysis**

Although the parties did not necessarily focus on the law associated specifically with Plaintiffs' individual counts as set forth in the Second Amended Complaint, the Court finds it prudent and necessary to do so. Plaintiffs allege six counts against Defendants under 42 U.S.C. § 1983 for violations of the United States Constitution under the Fourteenth Amendment and the Fourth Amendment. Five of those counts involve

---

(Footnote Continued From Previous Page)

allegations of denial of procedural due process:  (1) Violation of Due Process of Law;[3]
(2) Violation of Due Process of Law—Pre-Deprivation Hearing; (3) Violation of Due
Process of Law—Denial of Post-Deprivation Hearing; (5) Enforcement of
Unconstitutionally Vague Regulation; and (6) Violation of Due Process of Law—Lack of
Statutory Authority.  In one count, Plaintiffs allege a Fourth Amendment claim:
(4) Warrantless Search and Seizure.

Claims under the Fourteenth and Fourth Amendments are analyzed in separate and
distinct manners.  The Fourteenth Amendment provides, in relevant part:  "[n]o State
shall make or enforce any law which shall abridge the privileges or immunities of citizens
of the United States; nor shall any State deprive any person of life, liberty, or property,
without the due process of law . . . ."  U.S. Const. amend. XIV, § 1.  The procedural
component of the Due Process Clause protects property interests created not by the
Constitution but by "'rules or understandings that stem from an independent source such
as state law.'"  *Neal v. Fields*, 429 F.3d 1165, 1167 (8th Cir. 2005) (quoting *Town of
Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)).  In contrast, the Fourth Amendment
provides, in relevant part:  "[t]he right of the people to be secure in their persons, houses,
papers, and effects, against unreasonable searches and seizures, shall not be
violated . . . ."  U.S. Const. amend. IV.  "The Amendment guarantees the privacy, dignity,
and security of persons against certain arbitrary and invasive acts by officers of the
Government or those acting at their direction."  *Skinner v. Railway Labor Executives'*

---

[3]    In passing at the pretrial, Plaintiffs made reference to a substantive due process claim.

*Ass'n*, 489 U.S. 602, 613-14 (1989).  The Fourth Amendment applies to both criminal and civil matters but only prohibits *unreasonable* searches and seizures.  *Id.* at 619.

As stated in the July 30, 2010 Order, neither party analyzed or discussed specific counts in their separate summary judgment motions.  Rather, Plaintiffs sought partial summary judgment on their claims for declaratory and injunctive relief—not monetary relief—based on seven grounds.  Defendants raised five grounds to support their summary judgment motion.  Given this, in the July 30 Order, the Court ruled on each ground as presented in the individual motions with the understanding that some of the grounds were simply arguments alone that were not the basis for the entry of summary judgment.  Below, the Court follows that Order and provides further discussion on its rulings.

## II.     Plaintiffs' Motion

### A.     Fourth Amendment

The Supreme Court has held that a warrantless search of closely regulated industries is constitutional if the rules governing the search offer an adequate substitute for the Fourth Amendment warrant requirement.  *New York v. Burger*, 482 U.S. 691, 702-03 (1987).  A warrantless search is constitutional as long as (1) a substantial governmental interest is met; (2) the inspection is necessary to further the regulatory scheme; and (3) the inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.  *Id.*  Plaintiffs focus the majority of their motion on the

third prong.  In order for a rule to be an adequate substitute, it must do two things: it must provide notice to owners that their property may be searched for a specific purpose, and it "must limit the discretion of the inspecting officers."  *Id*. at 703.

In Count IV, Plaintiffs assert that House's Fourth Amendment rights were violated when House's fatigue inspection was conducted without a warrant and without a finding of probable cause or articulable suspicion by the inspecting officer.  Without conceding that Minnesota had adopted the North American Standard Inspection Level III procedures as of May 10, 2008, Plaintiffs explained in their summary judgment motion that "the appropriate inquiry [for this claim] is the extent to which the procedures in a Level III inspection provide a constitutionally adequate substitute for a warrant when conducting a fatigue inspection."  (Doc. No. 83 at 14.)  Plaintiffs contended that there was no constitutionally adequate substitute because there are no statutes or regulations or any other publicly-available documents describing Defendants' fatigue inspection procedures.  Defendants responded that House, who had approximately 30 years of experience as a commercial driver, was well aware that he could be subjected to periodic inspections under the FMCSRs.

For the purposes of this motion, the Court assumed that Minnesota had adopted the North American Standard Inspection Level III procedures as of May 10, 2008.  *See U.S. v. Parker,* 587 F.3d 871, 879 (8th Cir. 2009) (concluding that a Missouri statute, which is similar to Minnesota's statute, adopts the CVSA's

OOS criteria without explicitly referring to the North American Standards); *U.S. v. Knight*, 306 F.3d 534 (8th Cir. 2002) (concluding that an Iowa statute, which is similar to Minnesota's statute, adopts the CVSA's OOS criteria without explicitly referring to the North American Standards). Viewing the evidence in the light most favorable to Defendants, the Court concluded that there were genuine factual disputes involving the circumstances surrounding House's fatigue inspection that underlie the question of law concerning whether House's Fourth Amendment rights were violated when Defendants Norton and Ullmer issued House's OOS.

### B.    Pre-Deprivation and Post-Deprivation Review

Plaintiffs asserted that they were entitled to summary judgment on their claims that the Due Process rights of House and other commercial drivers were violated by Defendants' failure to provide pre-deprivation and post-deprivation review. Plaintiffs acknowledged that in certain circumstances a pre-deprivation hearing may not be available. However, they argued that the exception was not applicable in this case because Defendants' process itself for determining whether to issue a fatigue-based OOS order was unreliable. Defendants responded that Plaintiffs were not entitled to summary judgment on this issue because Defendants were not required to provide a pre-deprivation hearing to House and because a post-deprivation hearing was available through DATA-Q and through a complaint made directly to the MSP.

In order to establish a procedural due process violation, a plaintiff must prove that he or she was deprived of "an opportunity granted at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (internal quotations and citations omitted). Generally, where "deprivations of property [are] authorized by an established state procedure . . . due process [is] held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur." *Parratt v. Taylor*, 451 U.S. 527, 538 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). "Due process is a flexible concept, however, and calls only for such procedural protection as the particular situation demands." *Moore v. Warwick Pub. Sch. Dist. No. 29*, 794 F.2d 322, 327 (8th Cir. 1986). Thus, in certain circumstances, a prompt, meaningful post-deprivation review may satisfy the Due Process Clause. *See, e.g., FDIC v. Mallen*, 486 U.S. 230, 246 (1988).

Viewing the evidence in the light most favorable to Defendants, the Court concluded that Plaintiffs had not established that House was entitled to summary judgment based on his allegation that Defendants' failure to provide pre-deprivation and post-deprivation review violated House's Due Process rights. The Court notes that it is difficult to see how House's pre-deprivation claim will survive at trial.

## C.     Void-for-Vagueness

The United States Court of Appeals for the Eighth Circuit has summarized the void-for-vagueness doctrine as follows:

> The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments. A vague regulation is constitutionally infirm in two significant respects. First, the doctrine of vagueness incorporates notions of fair notice or warning, and a regulation violates the first essential of due process of law by failing to provide adequate notice of prohibited conduct. In short, a regulation is void-for-vagueness if it forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application. Second, the void-for-vagueness doctrine prevents arbitrary and discriminatory enforcement. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.

*Stephenson v. Davenport Comm. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (internal quotations and citations omitted).

Plaintiffs asserted that the term "fatigue" as used in 49 C.F.R. § 392.3 is unconstitutionally vague because the term is not defined in federal or Minnesota law. As a result, Plaintiffs argued that drivers have no way of knowing how tired is too tired to drive, which Plaintiffs asserted demonstrates that Defendants' enforcement is impermissibly arbitrary and subjective. In response, Defendants first noted that courts are more tolerant of imprecise statutory language when a civil statute is at issue. Defendants further asserted that the term "fatigue" is well understood to mean "tired, weary, sleepy, or exhausted."

As discussed below in section III.E, the Court agreed with Defendants on this issue and concluded that Plaintiffs were not entitled to summary judgment on void-for-vagueness grounds.

### D.    Defendants' Fatigue Criteria

Plaintiffs did not explain precisely how their argument concerning whether Defendants' fatigue criteria are based on medically sound principles applies to their claims.  For this reason, the Court concluded that no ruling is necessary with respect to this precise argument.

### E.    Authorization for Fatigue-Based OOS Orders

With respect to whether the applicable regulations authorize fatigue-based OOS orders, the Court concluded that there are genuine issues of factual dispute underlying the legal question on this issue.

### F.    Minnesota's Adoption of the FMCSRs

As discussed below in section III.D, the Court concluded that prior to August 1, 2009, Minnesota had adopted the FMCSRs into state law.

### G.    Injunctive Relief

Plaintiffs moved for summary judgment on their claims for injunctive and declaratory relief but not on their claims for money damages.  Plaintiffs explained that they are entitled to seek an injunction to prevent Defendants from doing what they have no legal right to do, *see Heartland Academy Comm. Church v. Waddle*, 427 F.3d 525, 530 (8th Cir. 2005), and that they are entitled to declaratory relief

under 28 U.S.C. § 2201. The Court concluded on July 30, 2010 that Plaintiffs were not entitled to injunctive or declaratory relief as a matter of law because, at this stage, Plaintiffs had not established success on the merits for any of their claims. *See Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

## III.    Defendants' Motion

### A.    Damages Claim for Alleged Constitutional Violations

Defendants asserted that they were entitled to summary judgment on Plaintiffs' Fourth Amendment claim for damages because House had a substantially reduced expectation of privacy and because House knew that he might be subjected to an inspection. Therefore, Defendants assert that based on the totality of the circumstances, Defendants' interview of House was not an unreasonable search. Plaintiffs, however, asserted that House's inspection was beyond the scope of an inspection contemplated by the FMCSRs or the NAST criteria. Using the legal standard discussed in section II.A. and viewing the evidence in the light most favorable to Plaintiffs, the Court concluded that there were genuine factual disputes underlying the question of law concerning whether House's Fourth Amendment rights were violated which precluded summary judgment, especially given Plaintiffs' assertion that the inspection went beyond the scope contemplated by the FMCSRs or the NAST criteria.

Defendants also moved for summary judgment on Plaintiffs' damages claims based on Defendants' alleged violations of House's Fourteenth Amendment rights to Due Process. Using the legal standard discussed in section II.B. and viewing the evidence in the light most favorable to Plaintiffs, the Court concluded that there were genuine factual disputes that precluded summary judgment. In reaching that decision, however, the Court cautioned Plaintiffs that a victory at the summary judgment stage did not equate to a victory at trial nor rule out the possibility of a directed verdict at trial, especially with respect to the factual issues surrounding the Due Process claim.

### B. Plaintiffs' Claim for Prospective Relief

Defendants requested an extension of time for the filing of their summary judgment motion. On May 5—the day their extension expired—the MSP issued a new General Order that instructs Troopers and CVIs not to issue OOS orders to commercial drivers who are too fatigued to safely drive, unless they also issue a citation at the same time for the same reason. Based on the May 2010 General Order, Defendants asserted that they were entitled to summary judgment on Plaintiffs' claims for prospective relief because the General Order cured any alleged systematic deficiencies about which Plaintiffs based their prospective or injunctive claims. Viewing the evidence in the light most favorable to Plaintiffs, the Court concluded that Defendants had not established that they were entitled to

summary judgment on this issue simply because the MSP had changed its procedures related to fatigue inspections.

### C.     Qualified Immunity

Defendants sought summary judgment based on their assertion that Norton and Ullmer were entitled to qualified immunity on Plaintiffs' damages claims for alleged violations of the Fourth and Fourteenth Amendments. Defendants also asserted that that the claims against Dunaski, Urquhart, and Thooft should be dismissed as a matter of law because those defendants had no personal involvement in the actions and because the doctrine on respondeat superior does not apply to § 1983 claims. Plaintiffs responded that Norton and Ullmer are not entitled to qualified immunity because "no reasonably competent officer would believe that their actions in issuing the OOSOs were constitutional, reasonable or lawful." (Doc. No. 93 at 42.) Plaintiffs further asserted that they have a valid *Monell* claim against Dunaski, Urquhart, and Thooft because those defendants are linked to MSP's flawed policy and practices related to the fatigue inspections.

Qualified immunity protects a government official from liability in a §1983 claim unless his or her conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. *Vaughn v. Green Cnty, Ark.*, 438 F.3d 845, 850 (8th Cir. 2006). As the Eighth Circuit has explained, to determine whether an official is entitled to qualified immunity, a court asks two questions: (1) whether, after viewing the facts in the light most

favorable to the party asserting the injury, there was a deprivation of a constitutional right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted. *Id.*

It is well-established that a governmental entity cannot be held liable under § 1983 on a respondeat superior theory. *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691 (1978). Thus, a government body cannot be held liable under § 1983 merely because it employs a tortfeasor. *Id.* at 691-92. For a municipality to be liable under § 1983, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] [a] constitutional violation." *Id.* at 694. Specifically, a plaintiff must identify a policy that is constitutionally deficient and must show that employees complied with the policy, thereby causing a constitutional violation. *Kuha v. City of Minnetonka,* 365 F.3d 590, 603-605 (8th Cir. 2003), *abrogated on other grounds by Szalba v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007). An "official policy involves a deliberate choice to follow a course of action . . . made from among various alternatives by an official who is determined by state law to have the final authority to establish governmental policy." *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (quotations and brackets omitted). Alternatively, a custom "is demonstrated by: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) the plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation." *Id.* (brackets omitted).

Viewing the evidence in the light most favorable to Plaintiffs, the Court concluded that there were no genuine issues of material fact with respect to the issue of Norton's and Ullmer's qualified immunity. Assuming for the purposes of the argument that House was deprived of a constitutional right and using an objective legal reasonableness standard, the Court concluded that Norton and Ullmer were entitled to qualified immunity on House's damages claims because Plaintiffs could not establish that a reasonable official in their situation would have understood that his or her conduct was unlawful. Furthermore, because Dunaski, Urquhart, and Thooft did not have any personal involvement in the May 10, 2008 incident and because Plaintiffs failed to establish that the MSP had a municipal policy or custom which was the moving force behind the constitutional violations alleged in this case, the Court concluded that the claims against Dunaski, Urquhart, and Thooft should also be dismissed as a matter of law.

### D.    Minnesota's Adoption of the FMCSR

With respect to statutory authority, the Court recognized that Plaintiffs alleged that there was no Minnesota state law that authorized Defendants' conduct

not that Defendants violated a state law.  The Court found Judge Blaeser's

June 8, 2010 Order and Memorandum to be persuasive and concluded that prior to

the 2009 amendment, the FMCSRs were part of Minn. Stat. § 221.605.  The 2009

amendment merely clarified that the statute incorporated the FMCSRs.

### E.   Void-for-Vagueness

Defendants sought summary judgment on Plaintiffs' void-for-vagueness

claim contained in Count Five by first arguing that Plaintiffs' attacks are improper

and untimely because OOIDA had a pre-enforcement opportunity to challenge

49 C.F.R. § 392.3 and because the regulation has existed for decades.  Defendants

next asserted that Plaintiffs' claim fails because people of ordinary intelligence

understand what conduct is prohibited by the regulation.  In response, Plaintiffs

pointed to Defendants' procedures and training materials (or lack thereof) to

demonstrate how the term is unconstitutionally vague.

The Court agreed with Defendants and granted them summary judgment on

this issue.  The standard for a void-for-vagueness challenge is explained in

section II.C above.  Viewing the evidence in the light most favorable to Plaintiffs,

the Court found that there was no genuine issue of material fact with respect to

whether "fatigue," as used in 49 C.F.R. § 392.3, is void for vagueness.  It is not.

Recognizing that neither Minn. Stat. § 221.605 nor 49 C.F.R. § 392.3 provides a

definition of "fatigue," the Court concluded that the common term as used in the

context of commercial drivers provides Plaintiffs and others similarly situated with sufficient notice regarding what conduct is prohibited by use of the term "fatigue."

## CONCLUSION

This Memorandum Opinion and Order is to be read in conjunction with the Court's July 30, 2010 Order.

**IT IS SO ORDERED.**


Dated:  September 7, 2010                s/Donovan. W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge