# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Owner-Operator Independent Driver
Association, Inc., a Missouri non-profit
entity; and Stephen K. House, a natural
person,

                    Plaintiffs,

v.

Mark Dunaski, Ken Urquhart, James
Ullmer, Doug Thooft, Christopher
Norton, and John Doe, all personally,
individually, and in their official
capacities,

                    Defendants.

Civil No. 09-1116 (DWF/LIB)

**FINDINGS OF FACT,
CONCLUSIONS OF LAW,
ORDER AND MEMORANDUM**

_____

Albert T. Goins, Sr., Esq., Goins Law Offices, Ltd., and Daniel E. Cohen, Esq., Joyce E.
Mayers, Esq., Paul D. Cullen, Jr., Esq., and Paul D. Cullen, Sr., Esq., counsel for
Plaintiffs.

Marshal Eldot Devine, and Thomas C. Vasaly, Assistant Attorneys General, Minnesota
Attorney General's Office, counsel for Defendants.

_____

This matter came before the Court for a trial without a jury on September 13, 14,

15, 16, 20, and 21, 2010.  Based upon the presentations of the parties, including the

testimony and exhibits submitted during the trial, the post-trial submissions, the entire

record before the Court, and the procedural history of the matter, and the Court being

otherwise duly advised in the premises, the Court hereby makes the following:

## FINDINGS OF FACT

1.     Plaintiff Owners-Operators Independent Drivers Association, Inc.

("OOIDA"), is a non-profit trade association organization of approximately 153,000

members.  OOIDA's President and Chief Executive Officer is James Johnston.  OOIDA's

members are small business truckers, professional employee drivers, and small business

drivers from across the country.  OOIDA appears in a representative capacity seeking

declaratory and injunctive relief on behalf of its members.

2.     Plaintiff Steven K. House ("House") is a commercial motor vehicle driver

who hauls freight in interstate commerce.  House has been a professional driver for

32 years, and he has driven between 3 and 3.5 million miles without a single accident.

House is a driver for Eagle Trucking Enterprises, Inc. ("Eagle"), a company he

established and for which he obtained federal motor carrier operating authority.

3.     Defendant Mark Dunaski ("Colonel Dunaski") is the Chief of the

Minnesota State Patrol.  He holds the rank of Colonel.

4.     Defendant Ken Urquhart ("Major Urquhart") is employed by the Minnesota

State Patrol and provides oversight to the Patrol's Commercial Vehicle Section and State

Capital Complex Section.  He holds the rank of Major in the Minnesota State Patrol.  At

all times relevant to the allegations in the Plaintiffs' Second Amended Complaint, Major

Urquhart held the rank of Captain and was the former Commander of the Commercial

Vehicle Section of the State Patrol.

5.      Defendant Doug Thooft ("Lieutenant Thooft") is employed by the Minnesota State Patrol.  He holds the rank of Lieutenant and oversees commercial vehicle activities in the southeast portion of the State.

6.      Defendant James Ullmer ("Ullmer") is employed by the Minnesota State Patrol and holds the position of Commercial Vehicle Inspector II.

7.      Defendant Christopher Norton ("Norton") is employed by the Minnesota State Patrol.  He holds the position of Commercial Vehicle Inspector II.

8.      Commercial Vehicle Inspectors ("CVIs") are not peace officers.  State Troopers are sworn, licensed peace officers.  The Minnesota State Patrol, which is a division of the Minnesota Department of Public Safety, enforces laws and regulations to promote and ensure the safe use of Minnesota roads and highways.  Minn. Stat. § 299D.03, subds. 1(b)(1) and (2) (2008).

9.      The Commercial Vehicle Enforcement Section, sometimes referred to as District 4700, is a division of the Minnesota State Patrol.  It operates state-wide and enforces laws and regulations that relate to the operation of commercial motor vehicles and drivers.

10.     The Minnesota State Patrol's Commercial Vehicle Enforcement Section collaborates with various members of the commercial motor carrier industry in Minnesota.  Although the Commercial Vehicle Enforcement Section asserts that it coordinates with the Federal Motor Carrier Safety Administration ("the FMCSA") and with other state and local agencies, the Court saw little proof of that during the trial.

3

Whether the coordination was initiated by the Commercial Vehicle Enforcement Section or the FMCSA, the public interest and the interest of public safety would be better served by meaningful coordination and collaboration between the FMCSA, the Commercial Vehicle Enforcement Section, and other state and local agencies.  It would also promote uniformity and consistency from one state to another, which would, in turn, serve the public interest and  the interest of public safety, and provide additional notice to similarly-situated plaintiff truck drivers across the country.

11.     The Motor Carrier Safety Assistance Program ("the MCSAP") is a nationwide grant program facilitated by the United States Department of Transportation ("USDOT") to further vehicle safety in partnership with the states by providing grant resources to those states.  There are five elements to the MCSAP:  (1) driver/vehicle inspections; (2) traffic enforcement; (3) compliance reviews; (4) public education and awareness; and (5) data collection.  49 C.F.R. § 350.109.  The first element–driver/vehicle inspections–is the issue that was tried before the Court.

Pursuant to the MCSAP, individual states are the primary enforcers of the highway safety regulations at roadside inspections.  In return for their acceptance of the MCSAP grants, a state assumes responsibility for enforcing the Federal Motor Carrier Safety Regulations ("the FMCSR") or other compatible state rules.  49 C.F.R. § 350.201; *see also Nat'l Tank Carriers v. Fed. Highway Admin. of the U.S. Dept. of Transp.*, 170 F.3d 203, 204-06 (D.C. Cir. 1999) (discussing the history of the MCSAP).  Minnesota has participated in the MCSAP since approximately 1984.

12.     Minnesota State Troopers have authority to enforce the FMCSRs that relate to interstate motor carriers and drivers as set forth in Minn. Stat. § 221.605, subd. 1, and referred to in Minn. Stat. § 169.025, which includes the issuance of citations and out-of-service orders ("OOS Orders") pursuant to Minn. Stat. § 221.605, subds. 1 and 2, and the North American Uniform Out-of-Service Criteria ("OOSC") referred to in Minn. Stat. § 221.605, subd. 3.  *See* Minn. Stat. § 221.605, subds. 2 and 3; Minn. Stat. § 299D.03, subd. 1(b)(13).

13.     The FMCSR requires carriers and drivers to be familiar with and to comply with the FMCSR, 49 C.F.R. §§ 390.11 and 392.1.  Section 392 of the FMCSR requires carriers and drivers to operate their vehicles in accordance with the laws, ordinances, and regulations of the jurisdiction in which a vehicle is being operated unless the FMCSR impose a higher standard of care than the applicable jurisdiction.  49 C.F.R. § 392.2.

Relevant to the events of May 10, 2008, is 49 C.F.R. § 392.3, which is entitled, "Ill or Fatigued Driver" and provides, in relevant part as follows:

> No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.

14.     CVIs, such as Ullmer and Norton, rely on the FMCSR and on the OOSC that is referenced in Minn. Stat. § 221.605, subd. 1, in carrying out their duties and responsibilities.  But CVIs like Ullmer and Norton, until recent training that the Court will reference below (*see* Findings of Fact ¶¶ 57 and 60), receive no such training about

5

such concepts as "reasonable articulable suspicion," "probable cause," and under what circumstances *Miranda* warnings are required.  *Miranda v. Arizona*, 384 U.S. 436 (1966). The authority of CVIs and the limitations on this authority are derived primarily from statutory and applicable case law, rules, and regulations, and Minnesota State Patrol policies that are generally carried out in General Orders and District memos.  *See, e.g.,* Minn. Stat. § 299D.06; Minn. Stat. § 221.605.

15.     The Commercial Motor Vehicle Safety Alliance ("the CVSA") is an international not-for-profit private organization comprised of local, state, provincial, territorial, and federal motor vehicle safety officials and industry representatives from the United States, Canada, and Mexico.  The CVSA's mission is "to promote commercial motor vehicle safety and security by providing leadership to enforcement, industry and policy makers," with the goal of "uniformity, compatibility and reciprocity of commercial vehicle inspections, and enforcement activities throughout North America by individuals dedicated to highway safety and security."  http://www.cvsa.org.  The CVSA has developed a North American Standard Training and Inspections ("NAST") criteria. Specially-trained instructors in each jurisdiction are authorized to conduct NAST inspections.  As part of the inspection criteria, the CVSA has developed the OOSC for the issuance of OOS Orders.  All states participating in the MCSAP have agreed that their inspectors will use the OOSC to carry out their functions under the FMCSR, specifically with respect to the issuance of OOS Orders.  *Nat'l Tank Carriers*, 170 F.3d at 205. Specifically, the FMCSR defines an OOS Order as:

> a declaration by an authorized enforcement officer of a Federal, State,
> Canadian, Mexican, or local jurisdiction that a driver, a commercial motor
> vehicle, or a motor carrier operation, is out-of-service pursuant to
> §§ 386.72, 392.5, 392.9a, 395.13, 396.9, or compatible laws, or the North
> American Standard Out-of-Service Criteria.

49 C.F.R. § 390.5.  Pursuant to the FMCSR, an authorized officer may issue an OOS

Order for a violation of the OOSC.  Ullmer and Norton were both NAST-certified

inspectors on May 10, 2008.

16.    Since 1988, the State of Minnesota has enforced the FMCSR with respect to

interstate commercial vehicles and their drivers under the authority of Minn. Stat.

§ 221.605 (2008 & Supp. 2009); Minn. Stat. § 169.025; 1988 Minn. Laws, ch. 544, §§ 1

and 25.  The statute provides in part:

> (a) Interstate carriers and private carriers engaged in interstate
> commerce shall comply with the federal motor carrier regulations in code of
> Federal Regulations title 49, parts 40, 382, 383, 387, and 390 through 398,
> *which are incorporated by reference*, and with the rules of the
> commissioner concerning inspections, vehicle and driver out-of-service
> restrictions and requirements, and vehicle, driver, and equipment checklists.

Minn. Stat. § 221.605, subd. 1 (Supp. 2009) (emphasis added).  The words "*which are*

*incorporated by reference*" were added to the statute in 2009.  *Id.*  This statute is enforced

by the Minnesota State Patrol and the Minnesota Department of Transportation.

Moreover, a person in violation of the statute may receive a misdemeanor citation and/or

be declared "out of service."  Minn. Stat. § 221.291 (2008 and Supp. 2009).  In this case,

there was no misdemeanor citation issued for House on May 10, 2008.

7

17.     Minnesota Statute sections 299D.03 and 299D.06 (Supp. 2009) clarify the Minnesota State Patrol's authority to issue OOS Orders as set forth in the OOSC for violations of the FMCSR.

18.     Specifically, the Minnesota State Patrol enforces 49 C.F.R. § 392.3 with respect to interstate commercial motor vehicle drivers based on the OOSC and applicable statutory authority as in Minn. Stat. § 221.605, Minn. Stat. § 299D.06, Minn. Stat. § 299.03, and other applicable federal and statutory laws, rules, and regulations.  The OOSC were adopted by Minn. Stat. § 221.605, subd. 3 (1988).  The OOSC are developed by the CVSA every year.  This not-for-profit organization is comprised of representatives from state and local governments, the FMCSA, and the trucking industry.  In 2008, the OOSC provided that drivers who were ill or fatigued shall be put out of service.  At that time, the Minnesota State Patrol determined that the out of service period should be ten hours.  Effective April 1, 2010, the CVSA's OOSC require fatigued drivers to be put out of service for ten hours.

19.     Level I and Level II Inspections tend to primarily address commercial vehicles while Level III Inspections focus more on the driver.  The Level III Inspection process includes observing the driver; reviewing his or her commercial driver's license, medical card, log books, and shipping documents; and interviewing the driver.

20.     Therefore, as part of a Level II Inspection, NAST Inspectors observe commercial vehicle drivers for signs of impairment due to not only fatigue, illness, or other reasons; interview drivers; and review the OOSC to determine the appropriate

action.  The OOSC authorizes the inspector to put a driver out of service who is fatigued or ill.

21.    There is little dispute that since the mid-1990s, as part of the requirement for accepting the MCSAP funding, the Commercial Vehicle Enforcement Section of the Minnesota State Patrol has had the goal to develop and implement programs to reduce the number of serious and fatal accidents on Minnesota roads and highways that are caused by or may involve commercial motor vehicles and their drivers.

Consequently, in 2000, the Commercial Motor Vehicle Enforcement Section made a decision to focus on fatigue impairment, seatbelt violations, and other traffic violations (collectively, "FIST").  This was, in substantial part, accomplished by conducting periodic Level III Inspections that included what are known as FIST Saturations at weigh stations in certain locations at roadside.

22.    The Level III Inspection procedure states, in pertinent part, under "Step 3, Greet and Prepare the Driver" that the Inspector should "observe the driver's overall condition for illness, fatigue, or signs of impairment."  Unfortunately, there is no further reference or definition for fatigue or illness in the remainder of the document.  *See* Pltfs' Trial Exh. 7; Defs' Trial Exh. 1.

23.    Prior to May 10, 2008, the date that House was issued the OOS Order for his fatigue, Commercial Motor Vehicle Drivers had no notice of the Defendants' fatigue inspection procedures.

9

24.     With respect to the events of May 10, 2008, there is no evidence, direct or circumstantial, that the observations made or recorded by Norton and Ullmer during their asserted fatigue inspection of House supported a reasonable or articulable suspicion that House was too ill or fatigued to drive a commercial motor vehicle safely.

25.     For at least seven years prior to May 10, 2008, Denise Nichols ("Nichols") was a Commercial Vehicle Safety Education Officer.  In that capacity, Nichols had the responsibility for training on issues related to fatigue.  Nichols gave Norton a fatigue training class prior to May 10, 2008.

26.     During Nichols' 17 years with the Minnesota State Patrol, she conducted between 2,000 and 2,500 commercial motor vehicle driver inspections and never once placed a driver out of service for fatigue.

Of more interest to the Court and circumstantial confirmation that there was a serious lack of training on the issues of fatigue and illness, despite the best intentions of the Minnesota State Patrol, Norton placed House out of service for fatigue within five months after being hired by the Minnesota State Patrol and within 48 hours after attending the Minnesota State Patrol's fatigue training class.  In fact, he placed four out of the six drivers that he first inspected out of service for fatigue.

27.     On May 10, 2008, House was operating his truck and arrived at the Red River Weigh Station ("the RWS") in Clay County, Minnesota, at approximately 8:15 p.m.

28.     At that time, House was accompanied by his wife, Jeanette L. House, who also holds a Commercial Driver's License ("CVL") and operates, when necessary, as a

co-driver.  On that date, Jeanette House and her adult son were accompanying House when they pulled in to the RWS.

29.     On May 10, 2008, the Minnesota State Patrol was conducting a FIST Saturation at the RWS.

30.     Even though House had been through the RWS numerous times before, he had never seen that many trucks parked in the parking area with Minnesota State Troopers parked in front of them with emergency lights flashing, along with additional cars and police officers in the scale area.  In fact, both House and Jeanette House testified that they had never seen an inspection like this in all of their years of experience, in substantial part, because of the number of trucks stopped, the number of law enforcement vehicles with lights flashing, and the number of inspectors who seemed to be moving from vehicle to vehicle.  House was directed to go through what is known as the by-pass lane.  However, when he did so, Norton jumped onto the side of his cab and yelled in a loud voice at him.  At that point, two other officers directed House to back down his truck and return to the scale.

31.     After House's truck was weighed, he provided the officer his log book, valid registration, and CVL.

32.     House's record of duty set forth in his log book was current, accurate, and consistent with Minnesota state law and federal law.  Moreover, at the time House arrived at the RWS, he was operating within the allotted time for driver on duty status established by the hours of service ("HOS") regulations.

11

33.     After the officers reviewed House's documents and log book, he was not issued a citation for violating any HOS regulations.  The officers also did not issue a citation to House or an OOS Order for violating any log book regulation.

34.     After House presented his credentials and documentation to Norton, House was told that he should go into the building and answer some questions.  House parked his truck and went to the building, as instructed.

35.     There is no dispute that none of the Defendants at any time informed House of the purpose of their questions or that they were engaged in a saturation exercise specifically intended to identify fatigued drivers that could result in an OOS Order.  In fact, the officers minimized the importance of the questions and even suggested, consistent with Plaintiffs' Exhibit 84, there was no "big issue" in question, that the officers just wanted to ask a few questions which they described would be in the nature of a survey.  Consistent with Plaintiffs' Exhibit 84, those questions were designed to be deceptive.  Even if the questioning itself, at that early stage, did not constitute a constitutional violation, the planned deception was unprofessional at best.

In fact, as established by Plaintiffs' Exhibit 84, which is a memo and directive from Lt. Steve  Lubbert with the Minnesota State Patrol that was issued to all District 47 100 Motor Vehicle Inspectors, Lt. Lubbert directed:  "I ask that you do not tell the drivers that you need to fill out a checklist (worksheet), that you are taking a survey or any other statements that you use to reference the report.  The report is for you to use to document what you observe, statements made by the driver, notes for you to reference to about the

event and as a guide to gather the various indicators from the different areas on the report." That is precisely what Defendants did.

36.    Jeanette House also went into the scale house for the purpose of using the restroom. She had not been directed there by the officers. However, while in the scale house, Ullmer approached her and asked her what her husband's neck size was. He then assured her that nothing bad was going to happen and that there were not going to be any tickets or citations.

Again, even assuming the exchange between Ullmer and Jeanette House was not unconstitutional in any way, it was unprofessional and deceptive. This is especially relevant to the notice issue before the Court because the Minnesota State Patrol stated that one of the significant reasons to proceed with fatigue evaluation and testing was to provide a deterrent to the public, especially truck drivers, so that every driver knew they could be tested and evaluated on the issue of fatigue. However, if there was no notice of the fatigue testing protocol, there could be no possible deterrent effect for the public, especially truck drivers.

37.    The first question asked by Norton of House was his neck size. House responded that he did not know his neck size.

38.    Then, Ullmer specifically asked House if had Playboy magazines in his truck. Again, even assuming that such a specific inquiry is not unconstitutional in any manner, there is no evidence in the record, direct or circumstantial, as to the relevance of such a question and why it would be asked to evaluate fatigue and illness.

13

39.     Norton then asked House how often he went to the restroom at night and how many times he opened his eyes at night when his wife was driving.  He was also asked whether he had a television and books in the sleeper berth of his truck.  House responded affirmatively to the presence of a televison and books, as well as to the question of his bladder activity and his wakefulness while off-duty in the sleeper berth.

40.     The Defendants also sought and recorded additional information related to House, including, but not limited to, his financial affairs; whether he slept with one or two eyes open; whether he had a cell phone, a television, a computer, food, or food wrappers in his cab; whether he had allergies, red-eyes, watery eyes, droopy eyelids, or was slow to respond; or whether there were illnesses of family members.

41.     House informed Norton that he was often accompanied on the road by his wife as co-driver and his adult son who has Down Syndrome.  Norton then asked House whether he could sleep in the sleeper berth with two other people.  House informed Norton that there was plenty of room and that, consequently, he could sleep comfortably and that he had done so for many years.

42.     House was then asked why his eyes were "red."  House responded that he had allergies and that he had gone off duty for at least 10 hours on the previous night.

43.     When House asked Ullmer what was going on, Ullmer stated that they were simply conducting a sleep study.  At trial, House stated that he had been misled by the Defendants' questions.  Once the questioning was concluded, Norton informed House

that he had "reached a determination that you [House] are too tired to drive."  It is at that point that Norton then placed House out of service for 10 hours.

44.    When House questioned Ullmer about the propriety of what was happening, House asserts that Ullmer replied, "Well, you better get used to it because . . . we're starting this here but . . . it's going to be nationwide."  Defendants had no specific recollection whether these exchanges occurred, and there was no narrative report prepared by either Defendant in addition to the checklist of questions (Pltfs' Exh. 14), which will be addressed by the Court below.

45.    Plaintiffs' Exhibit 14, a copy of the "Fatigued Driving Evaluation Checklist" that Norton prepared about House was introduced at trial.  A copy of the same checklist that Ullmer prepared about House was also received in evidence at trial.  (*Id.*)

46.    House testified that he did not believe that he was free to go because once he was temporarily detained for questioning inside a room at the RWS, the officers had his driver's license, all of his documents, and everything that he needed to proceed in his truck, whether he was driving or his wife was driving.  In other words, he could not proceed down the road with his vehicle without them.

47.    Ullmer testified that House "was not free to get up and go and drive down the road without [his] log book without subjecting himself to . . . penalties."

48.    House was placed out of service by the Defendants for 10 hours.  Ullmer told House that if House drove his truck within those 10 hours, there would be at least a $10,000 fine and jail.

15

49.     At no time on May 10, 2008 (or prior to this date), did House receive any notice of the fact that there would be a newly instituted procedure to evaluate the issue of fatigue or any notice of the "Fatigued Driving Evaluation Checklist" or the criteria on which the checklist was allegedly based.  Defendants acknowledge that they did not inform House of the existence of the "Fatigued Driving Evaluation Checklist" or the criteria that they were using.

50.     The Court finds House's testimony relating to the events of May 10, 2008, credible.  Further, Jeanette House corroborated House's testimony, in substantial part.

51.     After House received the OOS Order, his wife began operating their commercial motor vehicle to finish the trip to the State of Michigan.

52.     House was detained at the RTW on May 10, 2008, for approximately 60 minutes.

53.     On May 10, 2008, there were no limitations or restrictions on the scope of questions or subjects that the CVIs for the Minnesota State Patrol could ask during an inspection to determine the level of a driver's fatigue, illness, or impairment.

54.     Prior to August 24, 2010, a driver or carrier could challenge an inspection, including an OOS Order, through the "DataQ" complaint process.  This process was available to drivers and carriers through the FMCSA website, which is publicly accessible.  *See https://DataQs.fmcsa.dot.gov/login.asp*.  DataQ is "an electronic system for filing concerns about Federal and State data released to the public by the Federal Motor Carrier Safety Administration."  DataQ Log-in Screen, FMCSA Website.  DataQ

is a system that is operated by the FMCSA that allows drivers or carriers to challenge data in the SafeState system, if they think that such data is inaccurate.

"Through this system, data concerns are automatically forwarded to the appropriate office for resolution." *Id.* When a driver or carrier challenges the validity or accuracy of an Inspection Report or OOS Order, the FMCSA refers the challenge to the state in which the action took place.

55.   On May 10, 2008, the Minnesota State Patrol did not have a procedure to inform a driver being placed out of service about the DataQ process. Consequently, prior to the significant change that occurred to the internal review system for DataQ challenges, Sgt. Glen Bjornberg of the Minnesota State Patrol was responsible for resolving drivers' and carriers' DataQ challenges.

56.   Major Kent O'Grady ("Major O'Grady") testified at trial that the Minnesota State Patrol would be instituting a specific internal review system for drivers to challenge the issuance of an OOS Order. That process will enable a driver or carrier to submit a challenge through DataQ and will provide the challenging driver or carrier with an opportunity to be heard in person, by affidavit or e-mail, or by telephone. A final decision will be made by a designee of the Minnesota State Patrol and, as a final agency decision, will be appealable to the Minnesota Court of Appeals. The Court has been informed that this new system commenced on October 1, 2010.

57.   The Minnesota State Patrol issued General Order 10-25-002 (Determination of Commercial Vehicle Impairment Due to Illness and/or Fatigue and Related

Enforcement) on May 5, 2010, and updated the Order on August 24, 2010.  The General

Order makes several changes to clarify, in part, the limitations and restrictions of CVIs

and Troopers who conduct NAST inspections when impairment due to fatigue, illness, or

other causes is at issue.  First, during a NAST inspection, Troopers and CVIs are to

observe drivers for signs of impairment due to illness, fatigue, or other cause, but they

cannot expand the driver portion of the inspection to determine impairment unless they

have a reasonable articulable suspicion that the driver may be impaired.  Second, the

questions used to determine impairment must be reasonably related to whether the driver

can safely operate the vehicle at the time.  Untruthful or misleading statements to the

driver are no longer permitted.  Drivers are to be told the purpose of the questions if they

inquire, and they are not required to answer questions.  Third, a driver will not be ordered

out of service for fatigue or illness unless there is probable cause to believe that the

driver, due to fatigue or illness, is unsafe to drive because there is an imminent risk to

public safety.  When the driver is placed out of service, he is also to be given a citation.

Fourth, the Fatigue Inspection Checklist is no longer to be used to record observations

during a driver inspection.  Instead, documentation must be specific enough to show that

the requirements in the General Order have been met.

Notably, none of these procedures, limitations, or restrictions were in place on

May 10, 2008.

58.     On August 24, 2010, the Minnesota State Patrol also issued General Order

10-70-020 (Uniform Driver/Vehicle Out-of-Service) confirming that when a driver is

declared out of service, the Vehicle/Driver Inspection Report form must be completed.  In

conjunction with the issuance of this General Order, the Minnesota State Patrol modified

the standard language in the form to provide additional specificity in the notice of the

driver's and carrier's opportunity to challenge an OOS Order.  The notice now states:

> NOTE:  Drivers or carriers may challenge the accuracy or validity of a
> commercial vehicle inspection, including the issuance of an Out of Service
> Order, by contacting the Federal Motor carrier Safety Administration
> (FMCSA) at:  https://DataQ.fmcsa.dot.gov.
>
> If your citation for a fatigue and or illness violation is dismissed by a
> prosecutor or judge for lack of probable cause, or you are acquitted of the
> charge, you can make application through the DataQ system to have the
> related out of service order rescinded.

59.     The Minnesota State Patrol has posted General Orders 10-25-002,

10-25-010, and 10-70-020 on its website.

60.     Major O'Grady testified at the trial that inspectors will be trained so that

any questions that they ask of a commercial vehicle driver, either in a "normal" or

focused inquiry of a Level III Inspection must be related to that purpose and only based

upon, at a minimum, a reasonable, articulable suspicion that the driver, because of his or

her impairment, cannot continue to safely operate a motor vehicle if their ability to

operate a commercial vehicle poses "imminent risk to public safety."

Further, Troopers and CVIs must prepare a report consistent with the specific

requirements of General Order 10-25-002, filed on August 25, 2010 (Defs' Exh. 16).

61.     Any conclusion of law which is deemed a finding of fact is incorporated

herein as such.

Based upon the above findings of fact, the Court hereby makes the following:

## CONCLUSIONS OF LAW

1.     Warrantless searches in a closely regulated industry are constitutional as long as (1) a substantial government interest is met; (2) the inspection is necessary to further the regulatory scheme; and (3) the regulatory program advises the owner of the commercial vehicle that the search is pursuant to law, defines the scope of the inspection, and adequately limits the inspecting officers' discretion.  *New York v. Burger*, 482 U.S. 691, 702-03 (1987).

2.     Although Defendants were authorized to temporarily detain House on May 10, 2008, for a routine Level III Inspection, Defendants were not entitled to conduct the scope of investigation and questioning that they did.  In doing so, Defendants continued the detention of House beyond what was reasonably related to the circumstances that justified House's detention at the beginning of the weigh station stop. Defendants did not have a reasonable articulable suspicion that House was impaired, and the continued duration of the detention as well as the broad scope of questions by the Defendants constituted a seizure in violation of House's Fourth Amendment right against an unreasonable seizure.

3.     The regulatory program in place on May 10, 2008, did not allow House to be advised of the purpose for the detention, the purpose for the questioning, or the broad scope of the questioning.

4.     The regulatory program in place on May 10, 2008, did not properly and adequately limit the inspecting officers' discretion.

5.     The continued detention of House and the scope of the inquiry of House on May 10, 2008, was beyond the scope of a proper Level III Inspection, which therefore violated House's Fourth Amendment right to be free from an unreasonable seizure.

6.     Consequently, the decision to issue the OOS Order was arbitrary and not based upon a reasonable particularized suspicion, as is now required by General Orders of the Minnesota State Patrol that did not exist on May 10, 2008.

7.     Plaintiffs are entitled to prospective injunctive and declaratory relief based upon the Court's conclusion that House's Fourth Amendment right to be free from an unreasonable seizure was violated on May 10, 2008.

8.     Plaintiffs, as prevailing parties with respect to Count IV of the Second Amended Complaint, are entitled to apply for an award of reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

9.     Defendants did not violate House's due process rights when they did not provide him with a hearing prior to ordering him out of service.  Plaintiff is not entitled to any additional prospective relief in Count II because the Court finds that the Minnesota State Patrol's procedures satisfy due process requirements.  Neither House nor the members of OOIDA are likely to suffer constitutional injury, given the procedures established since May 10, 2008.

21

10.     On or before May 5, 2010, the Minnesota State Patrol did not afford drivers any meaningful post-deprivation review of an OOS Order.  The Defendants therefore did not provide House with a meaningful post-deprivation review of his OOS Order.  And, to the extent that on May 10, 2008, there was a process in place called the DataQ process that was the responsibility of Sgt. Glen Bjornberg, at least prior to August 24, 2010, there was no process in place to inform a driver in House's situation of that procedure. However, House did not suffer any damage on the date in question.  The Court will order an expungement of the record, but Plaintiffs are not entitled to any additional prospective injunctive relief in Count III because the Court finds that the Minnesota State Patrol's current procedures satisfy due process requirements.  Neither House nor the members of OOIDA are likely to suffer a constitutional injury, given the procedures established since May 10, 2008.

11.     Consistent with the Court's Order of July 30, 2010, the Court finds that Minnesota Statute § 221.605 adopted the FMCSR both prior and subsequent to the 2009 amendment to section 221.605.  The Court concludes that Minnesota Statute § 221.605 authorizes the issuance of OOS Orders based on fatigue, and did so on May 10, 2008.

12.     Consistent with the Court's Order of July 30, 2010, the use of the term "fatigue" in 49 C.F.R. § 392.3, adopted by Minn. Stat. § 221.605, is not unconstitutionally vague.

13.     Plaintiff OOIDA has associational standing pursuant to *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  However, given the General Orders

that were entered subsequent to May 10, 2008, the Court in the Order below will direct the parties to participate in mediation and settlement discussions with Magistrate Judge Leo I. Brisbois with respect to the remaining issues of prospective injunctive and declaratory relief.  In the event the parties are unable to reach an agreement, the Court will file a final order within 30 days of such notice with respect to the issues of prospective injunctive and declaratory relief.

14.     Any finding of fact which may be deemed a conclusion of law is incorporated herein as such.

Based upon the above findings of fact and conclusions of law, the Court hereby enters the following:

### ORDER

1.     Plaintiffs' claims against Defendants Colonel Mark Dunaski and Lieutenant Doug Thooft in their personal, individual, and official capacities are **DISMISSED WITH PREJUDICE** on the grounds that they had no personal involvement in the matters alleged in Plaintiffs' Second Amended Complaint.  This decision is consistent with the Court's July 30, 2010 and September 7, 2010 summary judgment orders.

2.     Plaintiffs' claims for damages against Defendants James Ullmer and Christopher Norton in their individual capacities are **DISMISSED WITH PREJUDICE** on the grounds that they are entitled to qualified immunity, consistent with the Court's July 30, 2010 and September 7, 2010 summary judgment orders.

3.      Count V of Plaintiffs' Second Amended Complaint, entitled Enforcement of Unconstitutionally Vague Regulation, is **DISMISSED WITH PREJUDICE** against all Defendants in their personal, individual, and official capacities, consistent with the Court's July 30, 2010 and September 7, 2010 summary judgment orders.

4.      Count VI of Plaintiffs' Second Amended Complaint, entitled Violation of Due Process of Law - Lack of Statutory Authority, is **DISMISSED WITH PREJUDICE** against all Defendants in their personal, individual, and official capacities.

5.      Count I of Plaintiffs' Second Amended Complaint, entitled Violation of Due Process of Law, is **DISMISSED WITH PREJUDICE** against all Defendants in their personal, individual, and official capacities, consistent with the Court's July 30, 2010 and September 7, 2010 summary judgment orders.

6.      Count II of Plaintiffs' Second Amended Complaint, entitled Violation of Due Process of Law - Pre-deprivation Hearing, is **DISMISSED WITH PREJUDICE** against all Defendants in their personal, individual, and official capacities.

7.      Count III of Plaintiffs' Second Amended Complaint, entitled Violation of Due Process of Law - Post-Deprivation Hearing, is **DISMISSED WITH PREJUDICE** against all Defendants in their personal, individual, and official capacities.

8.      Plaintiffs shall be entitled to file a motion with attached affidavits setting forth their request for reasonable attorney fees and costs.  The Court respectfully directs that a briefing schedule be worked out between Plaintiffs and Defendants, absent

settlement of this issue, to be submitted to the Court.  The Court reserves the right to set oral argument on this issue.

9.      The Court respectfully directs the parties to contact Magistrate Judge Leo I. Brisbois for the purpose of establishing a date for a settlement-mediation conference to discuss prospective injunctive and declaratory relief.  This conference should also address the issue of whether similarly-situated plaintiffs are entitled to expungement as the Court has ordered for Plaintiff Stephen K. House.  The Court will also make itself available to assist in any way appropriate in the settlement-mediation if it will be of assistance to the parties and the Magistrate Judge.

10.      Defendants shall expunge the record of Plaintiff Stephen K. House relating to the OOS Order issued on May 10, 2008.


Dated:  January 28, 2011                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge



## MEMORANDUM

As the parties are aware, the United States Supreme Court has held that a warrantless search of a closely-regulated industry is constitutional if the rules governing the search offer a constitutionally adequate substitute for the Fourth Amendment warrant requirement.  *New York v. Burger*, 482 U.S. 691, 702-03 (1987).  A warrantless search or seizure is constitutional as long as (1) a substantial governmental interest is met; (2) the

inspection is necessary to further the regulatory scheme; and (3) the inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.  *Id*.

In order for the rules regulating the search or seizure to provide an adequate substitute for the Fourth Amendment requirement, the rules must do two things:  they must provide notice to owners that their property may be searched for a specific purpose, and they "must limit the discretion of the inspecting officers."  *U.S. v. Knight*, 306 F.3d 534, 535 (8th Cir. 2002) quoting *Burger* at 703.

On May 10, 2008, the rules and procedures relating to a NAST Level III Inspection resulted in the temporary detention of House as well as a broad array of questions, all of which occurred, by the Defendants' own admission, without a reasonable articulable suspicion that House was impaired or otherwise fatigued.  During House's detention, the questions included, but were not limited to, such subjects as neck size, whether he had Playboy magazines in his truck, how many times he opened his eyes at night when his wife was driving, whether he had a television and books in his sleeper berth, and the adequacy of the size of the sleeper berth.

House and other similarly-situated truck drivers had no notice of this procedure, including the purpose of the detention, the scope of the questions, or the purpose of the questions.  Moreover, on May 10, 2008, there were no limitations or restrictions placed on the discretion of the inspecting officers, unlike the current practice of requiring a

reasonable articulable suspicion, as well as candor as to why the questions are being asked.

In light of *Burger*, there is no question that the United States Supreme Court recognized a diminished expectation of privacy in a closely-regulated industry. Consequently, the warrant and probable cause requirements that satisfy the traditional Fourth Amendment standards of reasonableness for a government seizure, detention, or search do not have the same application for the commercial trucking industry, because the commercial trucking industry is a closely-regulated industry subject to regulatory searches.  *United States v. Ford*, 248 F.3d 475, 480 (5th Cir. 2001); *United States v. Knight*, 306 F.3d 534 (8th Cir. 2002).

Commercial truck drivers are therefore necessarily aware that this regulatory scheme lessens expectations of privacy in their driving schedule and in their property, including their log books and related records.  49 C.F.R. § 395.8.  Any driver of a motor carrier operating on a public highway knows that he or she can be inspected from time to time in the interest of public safety.

However, as the United States Supreme Court stated in *Ornelas v. United States*, "principal components of a determination of reasonable suspicion or probable cause [are] the events which occurred leading up to the . . . search. . . ."  517 U.S. 690, 696 (1966). Here, Defendants expanded the routine commercial motor vehicle Level III Inspection without any reasonable articulable suspicion.  The questions were not reasonably related to whether House could continue to safely operate his vehicle.

Based on the record before the Court, there were no limitations placed on the inspectors on May 10, 2008.  In fact, CVIs were encouraged to be less than candid with the drivers and to not provide notice for the purpose of their questions during the continued detention of truck drivers like House.

Consequently, in the absence of a reasonable articulable suspicion, any limitations placed on the scope of the inquiry or inspection of House, or any notice of the procedures in place to evaluate whether drivers are too fatigued, ill, or impaired to drive safely, the duration of the detention and the scope of the inquiry constituted an unreasonable seizure in violation of House's Fourth Amendment rights.  The Court further concludes that Minnesota Statute § 221.605 authorizes the issuance of OOS Orders based on fatigue, and did so on May 10, 2008.

As observed by the parties, in *Keating v. Nebraska Public Power District*, 562 F.3d 923 (8th Cir. 2009), the Eighth Circuit observed that "[g]enerally, 'where deprivations of property [are] authorized by an established state procedure . . . due process [is] held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur.'"  However, an exception to the requirement for a pre-deprivation review exists where there is a need for expeditious action by the state and there is an overriding state interest in summary adjudication.  This exception is limited, of course, to those situations where the deprivation is not likely to result in a serious loss of property.  The amount of due process required is situation-specific.  *Moore v. Warwick Pub. Sch. Dist. No. 29*, 794 F.2d 322 (8th Cir.

1986).  Contrary to the position of Plaintiffs, it would indeed be impractical to provide some type of hearing officer at a weigh station or roadside area where commercial vehicle and driver inspections are normally conducted.  The Court must balance the rights and interests at stake for plaintiffs like House, including the nature of the intrusion to House with the duty of the Minnesota State Patrol to enforce the laws and to promote highway safety.

As the United States Supreme Court held in *Matthews v. Eldridge*, 424 U.S. 319 (1976), the Court must consider the following factors:  the private interest that will be affected by the governmental action; the risk of an erroneous deprivation of such interests through the rules of procedures used and the probable value, if any, of additional or entirely different procedural safeguards; and the government's interests, including the function involved and the fiscal administrative burdens that the additional or substitute procedural requirements would entail.  *Matthews* at 335; *see also Goldberg v. Kelly*, 397 U.S. 254 (1970).  The United States Supreme Court specifically noted that due process claims are essentially situational by stating "due process unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Matthews* at 334.  Consequently, when the Court analyzes and then applies the *Matthews* factors, Plaintiffs' due process claim must necessarily fail.  House did not suffer a serious loss and there were no potential long-term implications.  Therefore, House was not entitled to a pre-deprivation review.

The Court has concluded that the Minnesota State Patrol did not afford drivers a meaningful post-deprivation review of an OOS Order prior to May 5, 2010. Consequently, House was not provided with a meaningful post-deprivation review of his OOS Order after the May 10, 2008 incident. Even though the DataQ process was in place at that time, there was no procedure in place to inform a driver in House's situation of the review process. The Court has concluded that House did not suffer any damage, but the Court has ordered the expungement of his record. Because the Court has already concluded that the Minnesota State Patrol's current procedure satisfies due process requirements, House is not entitled to any additional prospective relief as it relates to Count III.

The Court has directed the parties to contact Magistrate Judge Leo I. Brisbois to establish a date for a settlement-mediation conference to discuss prospective injunctive and declaratory relief. The Court assumes that the focus of that conference will be on the procedures and protocol related to the current procedures in place, none of which essentially existed on May 10, 2008, and all of which the Court has found to be constitutional as long as they are followed by properly trained CVIs and law enforcement officers. It is in this context that the parties, with or without the assistance of the Magistrate Judge and the Court, should address issues of the procedure itself, and hopefully establish a procedure that can serve as an example for the rest of the country.

Consistency and uniformity will serve the Plaintiffs' and Defendants' interests and the interest of public safety.

D.W.F.